UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION – BAY CITY

IN RE:

TEVOORTWIS DAIRY, LLC,
    Debtor.
_____/

Case No. 19-21104-dob
Chapter 11 Proceeding
Hon. Daniel S. Opperman

## OPINION GRANTING DEBTOR'S
## MOTION TO USE CASH COLLATERAL WITH CONDITIONS

### Introduction

On August 15, 2019, this Court issued a bench opinion granting the Debtor's Motion to Use Cash Collateral with Conditions. The Court now enters this written Opinion fully setting forth the basis for that decision.

At first blush, this case presents a straightforward issue – can a debtor, who offers its major secured creditor adequate protection in the form of a post petition lien on assets that will increase in value at least $1,000,000 and monthly payments, as well as usual conditions, use that creditor's cash collateral? Normally, the answer is yes. In this case, however, this secured creditor sees failure and disaster for the Debtor within a year and asks this Court to deny Debtor's Motion. But as of today, the facts and law support Debtor's Motion, so the Court grants Debtor's request, with additional conditions, for the reasons stated in this Opinion.

### Jurisdiction

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1) and E. D. Mich. LR 83.50(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(M) (orders approving the use or lease of property including the use of cash collateral). All matters before the Court emanate from Title 11 of the United States Code and accordingly this Court has jurisdiction over this case.

1

Findings of Fact

The Court makes the following findings of fact based on the testimony of Cindy TeVoortwis and James Byars, as well as Exhibits A-AA and Exhibits 1-6 as admitted at an evidentiary hearing on August 7, 2019.

The Parties

 A.  The Debtor

The Debtor operates a dairy farm near Bad Axe, Michigan and milks between 2,697 and 2,957 cows since it filed its Chapter 11 petition on May 24, 2019. The Debtor's dairy operation is big by Michigan standards: 40 employees who milk cows three times per day, with annual revenues over $12,200,000 for 2018 with a capacity to handle 3,500 cows as permitted and 5,000 total capacity.

Although large, Debtor's financial performance over the years has declined, with losses of $1,200,000 in 2018 and an aggregate loss of $5,000,000-$6,000,000 over the last five years. This is in part because the Debtor expanded its operations and had unexpected problems with its concrete flooring and the resulting effect of damaging the Debtor's cows' health and milk production, as well as the decrease in the price of milk, the major source of Debtor's income. Since 2014, the Debtor has borrowed money, primarily from Greenstone Farm Credit Services ACA and Greenstone Farm Credit Services FLCA ("Greenstone" collectively, "Greenstone ACA" and "Greenstone FLCA" individually) or relied on loans or capital infusions from its individual members to purchase more cows and pay operating expenses.

 B. Greenstone ACA and Greenstone FLCA

Greenstone is a well-known agricultural lender in Michigan and is the Debtor's major secured creditor, holding a security or mortgage interest in virtually all of the Debtor's assets, as

2

19-21104-dob Doc 113 Filed 08/30/19 Entered 08/30/19 12:32:59 Page 2 of 13

well as assets of others associated with the Debtor.  Roughly, Greenstone ACA is owed $7,232,981 and Greenstone FLCA is owed $12,849,155 by the Debtor, which adds up to $20,082,136.  The monthly interest of all the Greenstone debts is approximately $89,000.  Greenstone enjoys a security or mortgage on property which it believes is worth $20,448,000, less some potential purchase money security interest debt.  At the time of filing, the Debtor also had approximately $450,000 in milk check proceeds.

      C.      Unsecured Creditors Committee

The Court appointed an unsecured creditors committee on June 24, 2019 to represent the unsecured creditors who are owed approximately $1,200,000.  These creditors are primarily trade creditors such as feed and agricultural suppliers.

<u>Pre Petition Events</u>

The Debtor started dairy operations in Huron County in 1999 with 600 leased cows and steadily grew its operations through 2014.  In 2014, the Debtor decided to expand its operations to handle 3,500 cows, which required new additions to its facility.   Part of this expansion included the building of a new milking facility which apparently was done with improper concrete flooring, which in turn, severely injured the Debtor's cows such that the Debtor lost 600 cows over a short period of time and continued to lose cows and milk production until recently.

Also, the price of milk dropped after 2014, further reducing the Debtor's gross income.  To counteract these events, the Debtor acquired additional milk cows, often with funds advanced by Greenstone.  Greenstone also used various options available to assist the Debtor, such as interest only loans and expanded borrowing base formulas.  During this time, the Debtor used the accounting services of Nietzke & Faupel, a recognized regional accounting firm specializing in agriculture, to report its financial status to Greenstone.

3

Greenstone calculated the Debtor lost $1,200,000 in 2018 and concluded that the Debtor needed to take other actions, such as liquidation. The Debtor disagreed and filed its Chapter 11 petition with this Court on May 24, 2019.

Immediate Bankruptcy Activities

Greenstone enjoys a security interest in virtually all of the Debtor's assets, including cash collateral. Of particular note was the approximate $450,000 cash held by the Debtor from the sale of milk. The Debtor receives two checks per month for its milk. The Debtor needed to use these monies to continue operations and sought approval to use the cash collateral. After some negotiations, the Debtor and Greenstone entered into an agreement to allow the use of cash collateral until August 26, 2019 and the Court approved that agreement by way of an Order dated June 14, 2019.

A few days prior, Greenstone filed a Motion for Relief from Stay and the Debtor subsequently objected to that Motion. The Court held a preliminary hearing and, at the request of the parties, continued the preliminary hearing to negotiate a possible resolution. At the August 1, 2019 hearing, the parties reported that settlement was unlikely and that a final hearing was necessary. To accommodate schedules of the parties and their counsel and to allow for discovery, the Court set a final hearing for September 11, 2019. Debtor's counsel, noting the gap of August 26, 2019 to September 11, 2019, requested the Court to hold a hearing to continue the use of cash collateral and, by agreement of the parties, the Court set this hearing for August 7, 2019.

The August 7, 2019 Hearing

In preparation of the August 7, 2019 hearing, both the Debtor and Greenstone filed supplemental pleadings. The Debtor requested continued use of cash collateral under modified terms through October 26, 2019. One term was the continuation of the monthly payment to

4

19-21104-dob    Doc 113    Filed 08/30/19    Entered 08/30/19 12:32:59    Page 4 of 13

Greenstone of $60,000, as set in the earlier cash collateral order. The Debtor also presented a modified budget projecting income and expenses to October 27, 2019.

Greenstone likewise presented information supporting its view that the Debtor should not be allowed to use cash collateral after August 26, 2019.

Testimony of Cindy TeVoortwis

Ms. TeVoortwis is the person associated with the Debtor who is most knowledgeable about the Debtor's operations and financial condition. In addition to facts previously stated in this Opinion, Ms. TeVoortwis testified that the Debtor's operations are becoming more efficient, in part because a new herd manager has been retained and he has implemented many suggested changes. As a result, the daily average of pounds of milk per cow was 71.3 in June, 73.8 in July, and 77.7 in August. On an energy corrected basis, the numbers were 74.8 in June and 76.3 in July. (Exhibit 6). The Debtor's goal is 80 pounds of milk per cow per day, which Ms. TeVoortwis considers likely.

Also, the Debtor has culled many unproductive cows and replaced them with new cows. While this act has dropped the number of cows, production and efficiency has climbed. This strategy has caused a decline in the value of cows because Greenstone values each milking cow at $1,350, but the average sale price for a cull cow is $615. The Debtor sold 404 cull cows netting $242,521 and bought 279 milking cows for $305,675 (Exhibit 4). This is an adverse effect on Greenstone's asset base.

Per Ms. TeVoortwis, Greenstone's asset base has improved greatly by the harvesting of haylage, the planting of corn, and the expected harvesting of corn silage and Exhibit 2 demonstrates this increase. On June 6, 2019, the Debtor had 8,000 tons of corn silage at $38.12 per ton for a total value of $304,960 and 5,200 tons of haylage at $55.07 per ton for a value of $286,364, for a total asset base of $6,038,000. By July 2, 2019, the numbers are 7,250 tons of corn

5

silage for a total of $276,370 and 8,100 tons of haylage for a value of $446,000, for a total asset base of $5,824,212. On August 5, 109, the numbers were reported to be 6,200 tons of silage at $236,300, 11,905 tons of haylage at $655,600, and new straw of 1,201 tons at $100 per ton worth $120,100, for a total asset base of $6,171.500.[1]

The Debtor projects that by September 26, 2019 these numbers will jump to 40,200 tons of silage worth $1,532,400; 15,000 tons of haylage worth $826,050 and 1,900 tons of straw worth $190,000, for a total asset value of $7,709,900. Stated differently, the Debtor claims Greenstone's cash collateral asset base increased about $100,000 as of August 5, 2019 and will increase to about $1,700,000 by September 26, 2019; all while staying current on trade and feed creditors and feeding the herd.

Exhibit 1 is the Debtor's projected cash flow and expense report through October 27, 2019 and it shows mixed results. Some periods show modest profits; others losses. The Debtor undoubtedly sees this trend and has a proposed solution: acquire more milk cows and increase revenue. To do that, Ms. TeVoortwis testified that the Debtor was negotiating with others to acquire the necessary cows to bring the Debtor's facility up to capacity.

<u>Testimony of James Byars</u>

Greenstone called Mr. Byars, who is a Vice President of Lending for Greenstone and has worked with the Debtor over the last few years. Again, some of Mr. Byars' testimony has been stated in this Opinion previously. In his view, the Debtor has done everything possible to become economically feasible, including personal loans and capital infusions, but these efforts were not successful. Likewise, Greenstone has used all of its options to help the Debtor, but to no avail.

---

1 Since the Debtor focused on the increase in the value of the haylage, corn silage and straw to support its Motion, the Court only addressed this increase in value. The remaining value of cash collateral, namely the cows, was not in issue and this value constitutes the difference between the total asset base and the reported values in this Opinion.

Specifically, Mr. Byars focuses on the $1,200,000 lost by the Debtor in 2018, the cumulative $5,000,000-$6,000,000 lost over five years and the Debtor's continued inability to reach and maintain a herd of 3,500 cows. For example, the Debtor should on the average replace 100 milk cows per month. A cull cow sells for $615 on the average, but a replacement milk cow can cost between $1,000-$1,350, leaving a shortage of $385 to $735 per head, or $38,500 or $73,500 for 100 head, per month. This amount must be funded from the Debtor's milk revenue, and the money has not been there to replace these cows.

Also, Mr. Byars testified that while milk prices have risen to $17.00-$17.50 per hundred weight through year end, the future prices for the first half of 2020 indicates a lower price of $16.00-$16.50.

Additionally, Mr. Byars doubts the Debtor is operating as efficiently as Ms. TeVoortwis may believe because many calculations are done internally and not reviewed by Nietzke & Faupel. Per Exhibit Y, $16.51 per hundred weight is the standard breakeven mark, and Mr. Byars needs outside verification to confirm whether the Debtor has met this mark. Failing drastic changes, Mr. Byars sees a small window of opportunity for the Debtor to liquidate by 2019, which he believes can be done. On cross examination, Mr. Byars admitted that he did not dispute the Debtor's increased value in haylage, silage, and straw.

Although he did not testify about Exhibit A, this Exhibit valued Debtor's haylage, silage, and cows at $6,038,000 as of June 6, 2019 and $5,817,800 for July 2, 2019.[2]

---

[2] Exhibit A also included a line item for Machinery, Equipment and Fixtures with a value of $972,000. The Exhibit also indicated there was likely little to no change from previous months, but left open the possibility of additional depreciation. For purposes of this Opinion only, the Court assumes the $972,000 value as a constant, much as it does for the milk proceeds generated by the Debtor.

## Law

### Section 361 and Section 363—Cash Collateral and Adequate Protection

Pursuant to 11 U.S.C. § 363(c)(2), a debtor in possession may not use cash collateral unless, each entity with an interest in cash collateral consents, or the court, after notice and a hearing, authorizes such use.

"Cash collateral" is defined in Section 363(a) as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents , or profits of property, whether existing before or after the commencement of a case under this title."

11 U.S.C. § 363(e) states:

> (e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

Section 361 of the Bankruptcy Code, lists ways a debtor can provide adequate protection. It states:

> When adequate protection is required under section ... 363 of this title of an interest of an entity in property, such adequate protection may be provided by—
>
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

8

A secured creditor with an interest in cash collateral is entitled to adequate protection to the extent of the anticipated or actual decrease in the value of the collateral during the course of the bankruptcy case. *See In re First S. Sav. Ass'n.*, 820 F.2d 700, 710 (5th Cir. 1987). Adequate protection is not to "substantially exceed that to which the secured creditor is entitled." *Travelers Ins. Co. v. Am. Agcredit Corp. (In re Blehm Land & Cattle Co.)*, 859 F.2d 137 (10th Cir. 1988). "The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy." *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987).

Adequate protection under Section 361 is determined by consideration of: "(1) the value of the interest; (2) the risk that the value of the encumbrance will decline; and (3) whether the debtor's adequate protection proposal protects value against such risks." *In re Cambridge Woodbridge Apartments, L.L.C.*, 292 B.R. 832, 841 (Bankr. N.D. Ohio 2003) (citing *Martin v. U.S. Commodity Credit Corp. (In re Martin)*, 761 F.2d 472, 477 (8th Cir. 1985)). In order to encourage reorganization, courts must be flexible in applying the adequate protection standard," which "flexibility, however, must not operate to the detriment of the secured creditor's interest," and "depends on the nature of the collateral and the nature of the debtor's proposed use of that collateral." *Martin*, 761 F.2d at 476.

Adequate protection can take different forms, including cash payments, additional or replacement liens, and an "indubitable equivalent," which should be decided on a case-by-case basis. *See O'Connor*, 808 F.2d at 1396-97 (citing *Martin*, 761 F.2d at 474). The "indubitable equivalent" has been defined as "the unquestionable value of a lender's secured interest in the collateral." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 310 (3rd Cir. 2010). An equity

cushion may alone provide sufficient adequate protection. *See, e.g., In re Campbell Sod, Inc.*, 378 B.R. 647, 653 (Bankr. D. Kan. 2007).

In a case cited by counsel for the unsecured creditors committee, *In re Vanas*, 50 B.R. 988 (Bankr. E.D. Mich. 1985), the court faced a similar fact situation in that the debtors were dairy farmers seeking to use milk proceeds to operate their farm. *Vanas* not only addressed the debtor's request to use cash collateral, but also various motions for relief from stay. For this Motion, *Vanas* is of use for the cash collateral issues, but the Court will not address the motion for relief from stay until the final hearing.

Analysis

The Motion before the Court is the Debtor's request to use cash collateral and its offer of adequate protection. Accordingly, the Court must look at Sections 361 and 363, and case law addressing these statutes.

Put simply, the Court must determine the nature and value of the cash collateral secured to Greenstone and then decide if the Debtor's offer of adequate protection is sufficient. *See Cambridge* and *Vanas*.

In this case, all agree that the assets to be determined are the cattle, haylage, silage, and straw, with the M&E held as a constant. All also agree that the two most liquid assets, milk proceeds and cattle sale proceeds, should be used to fund the day-to-day operations of the dairy enterprise. The parties disagree as to the terms and length of time of such use.

Using Greenstone's numbers, the value to protect is the $6,038,000 as of June 6, 2019. (Exhibit A). Ms. TeVoortwis' testimony, for the purposes of this Motion, is undisputed. The August 5, 2019 value of the same set of assets of $6,171,552 is higher and protects Greenstone. If the September 26, 2019 projections become true, these assets set increase in value to $7,709,900. These comparisons demonstrate adequate protection to Greenstone. When the monthly payments

of $25,000-$50,000, and then $60,000 are included, the financial requirements of Sections 361 and 363 are met in that replacement liens are given, payments are made, and an equity cushion exists.

But the concept of adequate protection means more than just calculating and comparing numbers. In this case, this added review is especially important and relevant. The current cash collateral order requires certain financial reporting, but the key to the Debtor's valuation of assets is the continued harvesting of haylage, straw, and silage - especially corn silage, which is still growing and needs to be harvested within a certain time frame. To provide Greenstone with needed assurance, the Court conditions the use of cash collateral upon requiring the Debtor to report the status of the harvesting, much as in the existing cash collateral order, but more so for corn silage.

The Debtor should identify the fields where the corn is currently growing and then starting September 1, 2019 (when corn silage may start to be harvested), report the number of acres harvested, the fields where the silage is harvested, and the amount of corn silage harvested and to be harvested. While the Court does not expect all of the corn silage to be harvested by September 26, 2019, it reserves Greenstone the right to ask for an expedited hearing if the amount of corn silage is not as projected by October 7, 2019 or earlier if significant unforeseen circumstances arise.

Second, the Court conditions the use of cash collateral on the retention of an accountant or financial expert, preferably Nietzke & Faupel. Presently, Greenstone has no confidence in the financial numbers supplied to it and the Debtor should have the support of a financial expert. The Court suggests September 1, 2019 as the deadline to request such a professional, or the filing of a pleading that details why such a professional cannot be hired.

Finally, the Court holds that the form for the Order for Use of Cash Collateral be as the current cash collateral order, with necessary changes to reflect the continuation date of October 26, 2019 and other dates consistent with this use. While the Court understands the Debtor's desire to have flexibility to obtain additional cows, Greenstone's need for adequate protection overrides that flexibility requirement. Moreover, the Court can and may modify the cash collateral order if that need arises.

In reaching this decision, the Court notes that the parties - the Debtor, Greenstone and the unsecured creditors committee – raised issues beyond the use of cash collateral on August 7, 2019. The Court heard and noted all of those concerns and, in some instances, acknowledges the arguments made. But the issue today is not whether the automatic stay should be lifted, whether the Debtor's Plan can be confirmed, or whether the Debtor's case should be dismissed. It is too early in this proceeding and too many factors or events may intervene.

Also, neither Sections 361 or 363, as well as applicable case law, notably *Vanas*, impose a requirement that the Debtor show an effective reorganization probability, such as required by 11 U.S.C. § 362(d)(2)(B) or 11 U.S.C. § 1112(b)(2) or (4). Since the statutes do not impose this requirement, the Court is reluctant to create this requirement, especially when this issue will be raised and adjudicated as early as September 11, 2019 at Greenstone's Motion for Relief from Stay hearing, or later at confirmation.

Presently, the Debtor has met its burden of proof to allow the use of cash collateral until October 26, 2019 under the conditions as stated in this Opinion, so the Court grants the Debtor's Motion with those conditions, as well as the conditions stated in the Motion.

**Signed on August 30, 2019**



/s/ Daniel S. Opperman
_____
Daniel S. Opperman
United States Bankruptcy Judge